# IN THE UNI TED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERENCE D. JACKSON, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 19-CV-3560 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| *et al.*, | : | |
|     Defendants. | : | |

## MEMORANDUM

**SCHMEHL, J. /s/ JLS**                                                                    **AUGUST 27, 2019**

      Plaintiff Terence D. Jackson, a prisoner incarcerated at the Federal Detention Center in Philadelphia ("the FDC"), filed this civil action along with a motion for leave to proceed *in forma pauperis*. Jackson asserts claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971) and the Federal Tort Claims Act ("FTCA") against the United States and several federal employees at the FDC in their official and individual capacities. Before the Court had an opportunity to address Jackson's Complaint, he filed an Amended Complaint, which is now the governing pleading in this case.[1] (ECF No. 7.) For the following reasons, the Court will grant Jackson leave to proceed *in forma pauperis*, dismiss certain Defendants and claims with prejudice, and dismiss certain Defendants and claims without prejudice for failure to state a claim. The Court will permit Jackson to file a second

---

[1] An amended complaint supersedes the prior pleading. *See Shahid v. Borough of Darby*, 666 F. App'x 221, 223 n.2 (3d Cir. 2016) (per curiam) ("Shahid's amended complaint, however, superseded his initial complaint." (citing *W. Run Student Hous. Assocs. LLC v. Huntingdon Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013)). "[L]iberal construction of a pro se amended complaint does not mean accumulating allegations from superseded pleadings." *Argentina v. Gillette*, No. 19-1348, 2019 WL 2538020, at *1 n.3 (3d Cir. June 20, 2019).

amended complaint if he is able to cure the defects identified by the Court in the claims dismissed without prejudice. Alternatively, Jackson may opt not to file a second amended complaint and instead proceed at this time on his remaining claims, *i.e.*, the claims the Court did not dismiss.

I.   **FACTS**[2]

The gist of Jackson's claims is that for seven months, medical officials at the Federal Detention Center allowed a serious infection in his nose to go untreated. According to the Amended Complaint, Jackson began to suffer constant nose bleeds on or about January 1, 2019 while in custody at the FDC. (ECF No. 7 at 3, ¶ 17.) He began submitting sick call requests, but they went unanswered until January 11, 2019, when he was seen by a medical professional who prescribed ointment and told Jackson not to put anything in his nose. (*Id.* at 3, ¶ 19.)

The bleeding continued, so Jackson submitted a sick call slip on January 29, 2019. He also submitted "cop outs" to the medical department stating that something was "really wrong" with his nose" because it has been bleeding constantly, and that the "old blood has been in [his] nose for so long that it's starting to smell." (*Id.* at 3-4, ¶¶ 20-23.) It appears he was seen by Defendant Nurse Practitioner Nelson during this time and that Nelson prescribed him a saline rinse. On February 21, 2019, Jackson was seen by medical providers and prescribed antibiotics after a large purple mass was found in his nose.

---

[2] The allegations are taken from Jackson's Amended Complaint. (*See* ECF No. 7.) Jackson also filed a "Motion Requesting to Add Insert Aemdned-2 and Amended-3," (ECF No. 8), which the Court understands to be a motion to attach exhibits to his Amended Complaint. The Court will grant that Motion. However, Jackson should be aware that he need not put forth his evidence and exhibits at the pleading stage of this case.

Over the next few days, Jackson sent more "cop outs" to the medical department about his nose, noting that the infection was "leaking out of [his] nose everyday" and affecting his ears, eyes, and mouth. (*Id.* at 4, ¶ 24.) He also reported having trouble breathing and that his eyes had turned red. Around this time, Jackson began corresponding with Defendants Dalmasi and Cassano about his condition.[3]

On February 25, he was treated by Defendant Kistler, a nurse practitioner in the FDC medical department. (*Id.* at 4.) Kistler observed that Jackson had bloodshot eyes, a swollen face and a purple mass that had grown over his right nostril. (*Id.*) That same day, February 25, 2019, Jackson was seen at Hahnemann Hospital where he had a radiological scan and was diagnosed with conjunctivitis and a rounded soft tissue within the anterior nares, most likely an "atypical nasal polyp/papilloma with anterior nasal cavity obstruction." (*Id.*) An unidentified person, presumably Kistler, wrote in notes that were presumably sent to the hospital that Jackson had:

> recurrent right epistaxis for the past two months, unresponsive to conservative treatment. Large purple mass found in right nares 2/21/19. Not present at previous exam on 2/5/19. Patient started on Bactrim (his history of MRSA) 2/21/19. With significant right-sided facial swelling and photophobia. Please perform CT if indicated to rule out sinusitis vs orbital cellititis.

(*Id.*) Jackson was prescribed antibiotics and released. (*Id.*) He alleges that officials at the FDC were instructed to follow up on his discharge instructions within three to five days with the Drexel Otolaryngology Clinic. (*Id.*)

Thereafter, Jackson received eye drops and his antibiotic was changed because his testing came back positive for MRSA. (*Id.*) His course of antibiotics was due to run through March 11, 2019. (*Id.*) Jackson continued to have nose bleeds during this period and complained in emails

---

[3] Defendant Cassano is identified as the Health Service Administrator at the FDC and Dr. Odeida Dalmasi is identified as the Clinical Director at the FDC. (ECF No. 7 at 1 & 3.)

3

to the medical unit that the medicine was ineffective. (*Id.*) He received responses from the medical unit on March 11, 19, and 20 stating he was scheduled to be seen. (*Id.* at 5-6.) On March 20, Jackson showed a correctional officer and Defendant Nelson that his nose was still bleeding and stated that he had an infection in his nose and eyes. (*Id.* at 6.)

Jackson continued to exchange emails with Defendants Dalmasi, Lawrie[4] and Cassano through April 15, 2019 about his condition and was seen again at Hahnemann Hospital on April 17. (*Id.*) The Amended Complaint suggests that Jackson did not receive any treatment from when his course of antibiotics finished on March 11 until his hospital visit on April 17. Jackson continued to suffer from his symptoms, and emailed Dalmasi, Lawrie and Cassano on numerous dates. (*Id.* 7.)

On May 15, 2019, Jackson was sentenced on his underlying criminal charges. *See United States v. Jackson*, Crim. Nos. 17-71 (E.D. Pa.) In response to a concern that Jackson receive medical treatment for his conditions, the Court entered an Order that same day directing that the Bureau of Prisons shall not transfer Jackson from the FDC pending further order of the Court. (*See id.* ECF No. 621.) The Court also recommended that Jackson be designated to a facility where he could receive treatment for his medical issues. (*Id.* ECF No. 634 at 3.)

Around this time, Jackson emailed Dalmasi and Cassano to let them know that he had eight bumps with brownish-white puss in them, one of which was on his leg and the size of a softball. (ECF No. 7 at 7.) Jackson received a response from Lawrie that he was on the list to be seek in two weeks and that he should report to sick call if the conditions got worse. (*Id.*) Jackson responded that he could not wait two weeks to be seen because the bumps were itchy,

---

[4] Lawrie is identified as the Assistant Health Service Administrator at the FDC. (ECF No. 7 at 3.)

causing him to scratch them and bleed. (*Id.*) Defendant Lawrie responded that he spoke with Jackson's ENT and that they will arrange the first appointment available that coordinated with schedules for the doctor and the Marshal Service. (*Id.*) On June 4, Jackson sent another email to Dalmasi, Lawrie, and Cassano about a tingling feeling on his skin that he attributed to the infection. (*Id.*) Lawrie replied that his symptoms sounded unrelated to his sinus issues, but that he forwarded the concerns to the doctors and Cassano. (*Id.*) Lawrie also suggested reporting to sick call to be seen for the skin issue. (*Id.*)

Jackson continued to send emails to Defendants Dalmasi, Lawrie and Cassano complaining about the lack of treatment for his nasal condition. According to Jackson, on July 5, Defendant Lawrie replied:

> I think we are well aware that we are awaiting a surgery date for the nose. We are at the mercy of your ENT doctor and when he is available they will conduct surgery. Due to Hahnemann Hospital closing this is a complicating issue that we are awaiting your doctor privileges to be approved at another hospital. However, we are continuing to be persistent in getting this surgery.

(*Id.* at 8.) Jackson replied that he knows he needs surgery to remove the mass in his nose, but that his bigger concern was that in the meantime, no one was addressing what he considered a separate infection in his nose that he believed was causing other infections. (*Id.*)

On July 6 and 7, Jackson saw Defendants Nelson and Kistler, both nurse practitioners, who told him to pinch his nose and hold his head back to stop his nose from bleeding. Jackson followed their instructions, but his nose continued to bleed. (*Id.*) He also addressed his constant nosebleeds with Nelson on July 8. (*Id.*) Nelson responded that Jackson was treated for a staph infection and given antibiotics, which she apparently stated were "strong enough to cover everything." (*Id.*) Jackson, however, disagreed because his nose continued to bleed, even though he also acknowledges that the infection in his nose was immune to most antibiotics. (*Id.*)

5

On the same day, Defendant Cassano told Jackson that officials at the FDC were trying to get his surgery scheduled, acknowledged that the antibiotics were not working, and allegedly stated there was nothing more they could do until he had surgery. (*Id.*)

On July 9, Jackson was given more antibiotics for his nose. (*Id.* at 9.) On July 11, Jackson experienced a bad nose bleed. Jackson asked two individuals to inform the guard, Officer Bestein. (*Id.*) Bestein said he would call the medical department. (*Id.*) When Jackson did not receive a response, he went to Bestein and showed him his nose. (*Id.*) Bestein called the medical department and Defendant Nelson arrived and told Jackson to pinch his nose and hold his head back. (*Id.*) Jackson alleges that during the seven months of interactions with the medical department about his nose, he attempted to address his concerns with other officials at various times, but generally received responses directing him back to the medical department. (*Id.* at 11-12.)

Jackson asserts *Bivens* claims for deliberate indifference to his serious medical needs, as well as a negligence claims pursuant to the Federal Tort Claims Act ("FTCA"). (*Id.* at 9-10.) His claims are predominately based on allegations that the Defendants failed to provide treatment for an infection in his nose causing him to experience seven months of continuous nose bleeds. (*Id.*) He also contends that certain Defendants failed to ensure that the health services unit at the FDC had in place adequate policies and procedures to provide that inmates with serious medical needs be seen immediately and treated. (*Id.*)

## II. STANDARD OF REVIEW

The Court grants Jackson leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.[5] Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) applies, which requires the Court to dismiss the Amended Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). The Court must "accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff," but disregard "threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" in determining whether a plaintiff has stated a claim. *See City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp*, 908 F.3d 872, 878 (3d Cir. 2018) (quotations omitted). As Jackson is proceeding *pro se*, the Court construes his allegations liberally. *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

## III. DISCUSSION

### A. FTCA Claims

The Federal Tort Claims Act ("FTCA") waives the sovereign immunity of the United States for torts of federal employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §

---

[5] However, as Jackson is a prisoner, he will be obligated to pay the filing fee in installments in accordance with the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915(b).

1346(b)(1); *see also* 28 U.S.C. § 2674 (providing that, for tort claims, the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances"); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004) (stating that "[t]he FTCA 'was designed primarily to remove the sovereign immunity of the United States from suits in tort, with certain specific exceptions, to render the Defendants liable in tort as a private individual would be under like circumstances.'" (quoting *Richards v. United States*, 369 U.S. 1, 6 (1962))). The United States is the only proper defendant in a FTCA action. *See CNA v. United States*, 535 F.3d 132, 138 n.2 (3d Cir. 2008); *Ynfante v. United States*, Civ. A. No. 13-767, 2015 WL 631055, at *4 (M.D. Pa. Feb. 12, 2015) ("A court, however, may not entertain an FTCA claim against 'any employee of the Defendants while acting within the scope of his office or employment.'" (quoting 28 U.S.C. § 2679(b)(1))). The FTCA allows federal inmates to sue the United States for injuries sustained while incarcerated. *See, e.g.*, *Ynfante*, Civ. A. No. 13-767, 2015 WL 631055, at *4.

Jackson has pled a basis for proceeding on his medical negligence claims against the United States at this time. However, to the extent he intended to bring FTCA claims against Defendants other than the United States, the Court will dismiss those claims with prejudice because the United States is the only proper defendant in a FTCA case and Jackson cannot cure the defects in those claims.

   **B.**  *Bivens* **Official Capacity Claims and Claims Against the United States**

In contrast to FTCA actions, a *Bivens* claim can only be asserted against individual officials. *Ynfante v. United States*, Civ. A. No. 13-767, 2015 WL 631055, at *5 (M.D. Pa. Feb. 12, 2015). "Indeed, it is well-settled that *Bivens* actions against the United States — and, by extension, against federal agencies or officials sued in their official capacity — are barred by

sovereign immunity, absent an explicit waiver of that immunity." *Id.*; *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Bell v. Rossott*, 227 F. Supp. 2d 315, 320 (M.D. Pa. 2002) (dismissing claim against individual federal defendants sued in their official capacity because the claims are essentially made against the United States). Because sovereign immunity precludes *Bivens* actions from being asserted against the United States or a federal employee in his or her official capacity, these claims must be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

### C. *Bivens* Individual Capacity Deliberate Indifference Claims

Unlike its passage of 42 U.S.C. § 1983, which provides a cause of action where a state actor violated a plaintiff's civil rights, Congress did not create "a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). However, the United States Supreme Court has held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures. *Id.* (citing *Bivens*, 403 U.S. at 397). After *Bivens*, the Supreme Court recognized an implied cause of action where prison officials are deliberately indifferent to a prisoner's serious medical needs. *See Carlson v. Green*, 446 U.S. 14 (1980). Here, Jackson invokes *Bivens* based on the Defendants' alleged deliberate indifference to his serious medical needs and their failure to institute policies and procedures to provide immediate treatment.[6] *See Farmer v. Brennan*,

---

[6] During the events in question, Jackson was at times a pretrial detainee and at times a convicted and sentenced prisoner. The Eighth Amendment governs claims brought by convicted inmates challenging their conditions of confinement, while the Due Process Clause of the Fifth Amendment governs claims brought by pretrial detainees in federal custody. *See Bistrian v. Levi*, 912 F.3d 79, 91 (3d Cir. 2018); *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).

9

511 U.S. 825, 835 (1994). A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

"A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). Additionally, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). There are

---

However, the standard under these amendments for claims related to a prisoner's medical needs is essentially the same for purposes of the analysis. *See Parkell v. Morgan*, 682 F. App'x 155, 159 (3d Cir. 2017) (per curiam); *see also Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (declining to address whether a new standard applies to claims raised by pretrial detainees based on issues related to medical care).

"two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 135 S. Ct. 2042 (2015). First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* Where the claim is based on the failure of a supervisor to institute or enforce a policy, a plaintiff must be able to identify a supervisory practice which a defendant failed to employ, and show "'both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval.'" *C.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000) (quoting *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir.1997) (quoting *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 673 (3d Cir.1988))).

### 1. Claims Against Medical Defendants

Jackson has named the following individuals as Defendants, all of whom are identified as medical professionals or medical administrators at the FDC: (1) Dr. Odeida Damasi, Medical & Clinical Director; (2) Dr. Laughingwell, Medical & Clinical Director; (3) Mr. Cassano, Health Service Administrator; (4) Mr. Lawrie, Health Service Administrator; (5) Nurse Practitioner Kistler; (6) Nurse Practitioner Bestedo; (7) Nurse Practitioner Nelson; (8) Nurse Pena, and infectious disease nurse; (9) Antonio Fausto, a "mid-level practitioner" responsible for "handling

11

triage" and prescribing medication "on his assigned case load"; (10) Nurse Hepner, responsible for "dispensing medication and triaging when needed"; and (11) Nurse Sogo, responsible for "dispensing medication and triaging when needed." (ECF No. 7 at 1 & 3.) He also raises claims against two psychologists, Dr. Daniels and Dr. Brinkley. Jackson has stated a plausible basis for proceeding against some Defendants, but not others.

Taking Jackson's factual allegations as true and drawing reasonable inferences in his favor, he experienced a nose bleed and various other infections for a period of seven months. The Amended Complaint indicates that medical staff at the FDC were aware Jackson needed surgery related to the mass in his nose and were experiencing difficulties scheduling that surgery. The Court understands Jackson to be alleging that, regardless of the surgery, there was a separate infection in his nose that medical staff refused to treat for various periods of time, and which was causing additional infections. The Amended Complaint alleges that Jackson was provided some level of care, at least initially, but that additional care was denied or delayed while Jackson experienced nose bleeds over the course of several months.

Taking Jackson's allegations as true and taking all of the inferences in his favor, as the Court is obligated to do at this early stage of the litigation, he has alleged a basis for proceeding against those Defendants whom he alleges were regularly involved in and responsible for his care during this period of time, and thus aware of the symptoms Jackson was experiencing. That includes Defendants Dalmasi, Lawrie, and Cassano, who were regularly corresponding with Jackson about his medical situation and who appear to have been responsible for coordinating care, as well as Nurse Practitioners Kistler and Nelson, who saw Jackson for his ailments during this period of time. Whether Jackson was suffering from an infection in his nose that required

12

treatment apart from the surgery, and whether any delays in treatment could be reflective of deliberate indifference under the circumstances are factual matters best left to discovery.

However, Jackson has not stated a claim against Defendants Laughingwell, Bestedo, Pena, Fausto, Hepner, or Sogo. The only allegation against these Defendants is that they, along with Cassano, Lawrie, Dalmasi, Kistler, and Nelson,

> showed deliberate indifference to [his] serious medical needs by not ensuring that the health service unit at FDC Philadelphia had in place adequate policies & procedures, that were followed by subordinates that provided for [a] [prisoner] with serious medical needs to be immediately seen & reviewed by medical [personnel] to treat and address medical issues.

(ECF No. 7 at 10, ¶ 74.) Jackson does not allege facts suggesting that Defendants Laughingwell, Bestedo, Pena, Fausto, Hepner, or Sogo were aware of his situation or that they were responsible for his care. Additionally, the Amended Complaint does not plausibly allege that Bestedo, Pena, Fausto, Hepner, or Sogo could be considered policy makers. Nor does Jackson plausibly allege a basis for holding Laughingwell liable on a general failure to put policies in place. Indeed, he has not pled a basis for such a claim against any Defendant because his allegations are generalized and do not plausibly indicate that any alleged denial or delay in Jackson's treatment was tied to a failure to implement a particular policy.

As noted above, Jackson also brings claims against two psychologists, Dr. Daniels and Dr. Brinkley. Jackson alleges that he was stressed about the situation with his nose, so he sought to be seen by a psychologist. (ECF No. 7 at 11, ¶ 75-D.) On one occasion, Dr. Daniels told Jackson "she understands, and [he] will be seen" but he was not seen by a psychologist. (*Id.*) Jackson alleges that he emailed Dr. Brinkley asking to be seen by a psychologist because he was becoming depressed by his medical situation, but his email went unanswered and he believes that

13

doctor gave him "a cold shoulder" when he tried to address him. (*Id.* at 11, ¶ 75-E.) These are the only allegations against these doctors.

Although mental health needs constitute serious medical needs, Jackson's allegations, as pled, do not plausibly suggest that he was experiencing a serious medical need with regard to his mental health. *See, e.g.*, *Goodrich v. Clinton Cty. Prison*, 214 F. App'x 105, 111 (3d Cir. 2007) ("A mental illness may constitute a serious medical need."). The Court does not intend to minimize Jackson's frustrations and stress from his medical situation, but his allegations do not reflect that he suffered from a serious mental health need that required psychological services. Even assuming the seriousness of his mental health needs, the Amended Complaint does not plausibly allege that Drs. Daniels and Brinkley acted with deliberate indifference by failing to ensure those services were provided at the (unknown) time and under the (unclear) circumstances requested. Jackson must provide additional factual allegations about the circumstances giving rise to these claims if he seeks to proceed on them.

### 2. Claims Against Non-Medical Defendants

Jackson also raises claims against the following individuals, all of whom appear to be prison employees who are not medical professionals or otherwise involved in the administration or coordination of medical care: (1) Warden Marler; (2) Lt. Wright; (3) Lt. Shannon; (4) Lt. Frontino; (5) Unit Manager Cole; (6) Unit Manager Cerda; (7) Counselor Perez; (8) A.W. Knox; (9) Officer Moore; (10) Officer Burt; (11) Officer Burton; (12) Officer Garcia; and (13) Officer Bastien.[7] Jackson has not pled a plausible deliberate indifference claim against any of these Defendants.

---

[7] Although unclear, Officer Bastien may be the same individual as Officer Bestein.

The only basis for Jackson's allegation against Defendant Knox is that on April 5 he emailed her "explaining to her the trouble he was having and how long it's been since [he] received any medical treatment." (ECF No. 7 at 6, ¶ 46.) Jackson also alleges that he "attempted to address the situation" with Wright on an unidentified occasion "during mainline" and Wright "brushed [him] off." (*Id.* at 11, ¶ 75-B.) After addressing Wright, Jackson "attempted to address the situation with Lt. Frontino," who consistently directed him to the medical department. (*Id.* at 11, ¶ 75-C.) Similarly, Jackson generally alleges that Unit Managers Cole and Cerda, and Lt. Shannon referred him to the medical department when he tried to explain his medical problems and forwarded his complaints to the medical department rather than addressing them himself. (*Id.* at 11, ¶¶ 75-F, 75-G, 75-I, 75-J & 75-N.) He claims that Counselor Perez was rude and threatening to him when he attempted to address the matter with him. (*Id.* at 11, ¶¶ 75-H & 75-K.) Jackson alleges that Defendants Burton, Burt, Garcia, and Bastien—all of whom are identified as Housing Unit Officers—"informed medical when [Jackson's] nose was bleeding" and "witnessed medical not addressing [his] nose bleeding when they evaluated [him]." (*Id.* at 12, ¶¶ 75-O, 75-P, 75-Q, 75-R & 75-S.) Jackson alleges that Warden Marler issued unsatisfactory responses to his administrative grievances. (*Id.* at 11, ¶ 75-M.) He does not allege a basis for his claims against Housing Officer Moore.

"If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236. The common theme in Jackson's allegations against non-medical Defendants is that he talked with them or emailed them at various undefined points about his medical situation and/or frustrations with the medical department, and those Defendants either referred him back to the medical department or failed to override the judgement of medical professionals with their own.

15

It is apparent that Jackson believes the medical department was not providing the care he required. However, whether Jackson required additional care while he awaited surgery and the nature of that treatment are medical judgments that fall to the responsibility of medical professionals. *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) ("Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor."); *see also Bearam v. Wigen*, 542 F. App'x 91, 92 (3d Cir. 2013) (per curiam) ("[A]s nonmedical personnel, Wigen is entitled to presume the competence of medical staff in treating a prisoner, meaning that his conduct cannot, without much more, amount to 'deliberate indifference.'"). Similarly, Warden Marler's allegedly unsatisfactory responses to Jackson's grievances and/or administrative claims are not a legitimate basis for a deliberate indifference claim under the circumstances here. *See Carter v. Smith*, 483 F. App'x 705, 708 (3d Cir. 2012) (per curiam) ("Prison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff."). Accordingly, Jackson has not alleged a plausible deliberate indifference claim against the non-medical Defendants.

## IV. CONCLUSION

For the foregoing reasons, the Court will dismiss with prejudice Jackson's FTCA claims against the individual Defendants, his *Bivens* claim against the United States and his *Bivens* claims against the individual Defendants in their official capacities. The Court will dismiss Jackson's *Bivens* claims against the following Defendants in their individual capacities without prejudice: (1) Laughingwell; (2) Bestedo; (3) Pena; (4) Fausto; (5) Hepner; (6) Sogo; (7) Dr. Daniels; (8) Dr. Brinkley; (9) Warden Marler; (10) Lt. Wright; (11) Lt. Shannon; (11) Lt.

16

Frontino; (12) Unit Manager Cole; (13) Unit Manager Cerda; (14) Counselor Perez; (15) A.W. Knox; (16) Officer Moore; (17) Officer Burt; (18) Officer Burton; (19) Officer Garcia; and (20) Officer Bastien.  However, Jackson will be permitted to file a second amended complaint in the event he can allege additional facts that would support a basis for a claim against these Defendants.  If he does not file a second amended complaint, the Court will direct service so he may proceed on the following claims: (1) an FTCA claim against the United States; and (2) *Bivens* claims against Cassano, Lawrie, Dalmasi, Kistler, and Nelson in their individual capacities.   The Court will hold Jackson's Motion for Appointment of Counsel in abeyance until it is clear whether he will be filing a second amended complaint in this case.  An appropriate Order follows.

**BY THE COURT:**


**/s/ Jeffrey L. Schmehl**
**JEFFREY L. SCHMEHL, J.**