IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERENCE D. JACKSON,<br>    Plaintiff, | :<br>:<br>: |
| v. | :   CIVIL ACTION NO. 19-3560<br>: |
| UNITED STATES OF AMERICA,<br>*et al.*,<br>    Defendants. | :<br>:<br>: |

<u>**MEMORANDUM**</u>

**Schmehl, J.**   /s/ JLS                                                                                              **March  29, 2021**

     Plaintiff Terence Jackson asserts claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971) and the Federal Tort Claims Act ("FTCA") against the United States and several federal employees at the FDC.

**I.      FACTS**

     The gist of Jackson's claims is that for seven months, medical officials at the Federal Detention Center allowed a serious infection in his nose to go untreated.  According to the Amended Complaint, Jackson began to suffer constant nose bleeds on or about January 1, 2019 while in custody at the FDC.  (ECF No. 7 at 3, ¶ 17.)  He began submitting sick call requests, but they went unanswered until January 11, 2019, when he was seen by a medical professional who prescribed ointment.  (*Id.* at 3, ¶ 19.)

     The bleeding continued, so Jackson submitted a sick call slip on January 29, 2019.  He also submitted "cop outs" to the medical department stating that something was "really wrong" with his nose" because it has been bleeding constantly. (*Id.* at 3-4, ¶¶ 20-23.) It appears he was seen by Defendant Nurse Practitioner Nelson during this time and that Nelson prescribed him a

1

saline rinse. On February 21, 2019, Jackson was seen by medical providers and prescribed antibiotics after a large purple mass was found in his nose.

Over the next few days, Jackson sent more "cop outs" to the medical department about his nose, noting that the infection was "leaking out of [his] nose everyday" and affecting his ears, eyes, and mouth. (*Id.* at 4, ¶ 24.) He also reported having trouble breathing and that his eyes had turned red. Around this time, Jackson began corresponding with Defendants Dr. Dalmasi and Cassano, the Health Services Administrator at the FDC, about his condition.

On February 25, he was treated by Defendant Kistler, a nurse practitioner in the FDC medical department. (*Id.* at 4.) Kistler observed that Jackson had bloodshot eyes, a swollen face and a purple mass that had grown over his right nostril. (*Id.*) That same day, February 25, 2019, Jackson was seen at Hahnemann Hospital where he had a radiological scan and was diagnosed with conjunctivitis and a rounded soft tissue within the anterior nares, most likely an "atypical nasal polyp/papilloma with anterior nasal cavity obstruction." (*Id.*) An unidentified person, presumably Kistler, wrote in notes that were presumably sent to the hospital that Jackson had:

> recurrent right epistaxis for the past two months, unresponsive to conservative treatment. Large purple mass found in right nares 2/21/19. Not present at previous exam on 2/5/19. Patient started on Bactrim (his history of MRSA) 2/21/19. With significant right-sided facial swelling and photophobia. Please perform CT if indicated to rule out sinusitis vs orbital cellititis.

(*Id.*) Jackson was prescribed antibiotics and released. (*Id.*) He alleges that officials at the FDC were instructed to follow up on his discharge instructions within three to five days with the Drexel Otolaryngology Clinic. (*Id.*)

Thereafter, Jackson received eye drops and his antibiotic was changed because testing came back positive for MRSA. (*Id.*) His course of antibiotics was due to run through March 11, 2019. (*Id.*) Jackson continued to have nose bleeds during this period and complained in emails

2

to the medical unit that the medicine was ineffective. (*Id.*) He received responses from the medical unit on March 11, 19, and 20 stating he was scheduled to be seen. (*Id.* at 5-6.) On March 20, Jackson showed a correctional officer and Defendant Nelson that his nose was still bleeding and stated that he had an infection in his nose and eyes. (*Id.* at 6.)

Jackson continued to exchange emails with Defendants Dalmasi, Lawrie, the Associate Warden for Operations at the FDC and Cassano through April 15, 2019 about his condition and was seen again at Hahnemann Hospital on April 17. (*Id.*) The Amended Complaint suggests that Jackson did not receive any treatment from when his course of antibiotics finished on March 11 until his hospital visit on April 17. Jackson continued to suffer from his symptoms, and emailed Dalmasi, Lawrie and Cassano on numerous dates. (*Id.* at 7.)

On May 15, 2019, Jackson was sentenced on his underlying criminal charges. *See United States v. Jackson*, Crim. Nos. 17-71 (E.D. Pa.) In response to a concern that Jackson receive medical treatment for his conditions, the Court entered an Order that same day directing that the Bureau of Prisons shall not transfer Jackson from the FDC pending further order of the Court. (*See id.* ECF No. 621.) The Court also recommended that Jackson be designated to a facility where he could receive treatment for his medical issues. (*Id.* ECF No. 634 at 3.)

Around this time, Jackson emailed Dalmasi and Cassano to let them know that he had eight bumps with brownish-white puss in them, one of which was on his leg and the size of a softball. (ECF No. 7 at 7.) Jackson received a response from Lawrie that he was on the list to be seen in two weeks and that he should report to sick call if the conditions got worse. (*Id.*) Jackson responded that he could not wait two weeks to be seen because the bumps were itchy, causing him to scratch them and bleed. (*Id.*) Defendant Lawrie responded that he spoke with Jackson's ENT and that they will arrange the first appointment available that coordinated with

3

schedules for the doctor and the Marshal Service. (*Id.*) On June 4, Jackson sent another email to Dalmasi, Lawrie, and Cassano about a tingling feeling on his skin that he attributed to the infection. (*Id.*) Lawrie replied that his symptoms sounded unrelated to his sinus issues, but that he forwarded the concerns to the doctors and Cassano. (*Id.*) Lawrie also suggested reporting to sick call to be seen for the skin issue. (*Id.*)

Jackson continued to send emails to Defendants Dalmasi, Lawrie and Cassano complaining about the lack of treatment for his nasal condition. According to Jackson, on July 5, Defendant Lawrie replied:

> I think we are well aware that we are awaiting a surgery date for the nose. We are at the mercy of your ENT doctor and when he is available they will conduct surgery. Due to Hahnemann Hospital closing this is a complicating issue that we are awaiting your doctor privileges to be approved at another hospital. However, we are continuing to be persistent in getting this surgery.

(*Id.* at 8.) Jackson replied that he knows he needs surgery to remove the mass in his nose, but that his bigger concern was that in the meantime, no one was addressing what he considered a separate infection in his nose that he believed was causing other infections. (*Id.*)

On July 6 and 7, Jackson saw Defendants Nelson and Kistler, both nurse practitioners, who told him to pinch his nose and hold his head back to stop his nose from bleeding. Jackson followed their instructions, but his nose continued to bleed. (*Id.*) He also addressed his constant nosebleeds with Nelson on July 8. (*Id.*) Nelson responded that Jackson was treated for a staph infection and given antibiotics, which she apparently stated were "strong enough to cover everything." (*Id.*) Jackson, however, disagreed because his nose continued to bleed, even though he also acknowledges that the infection in his nose was immune to most antibiotics. (*Id.*) On the same day, Defendant Cassano told Jackson that officials at the FDC were trying to get his

surgery scheduled, acknowledged that the antibiotics were not working, and allegedly stated there was nothing more they could do until he had surgery. (*Id.*)

On July 9, Jackson was given more antibiotics for his nose. (*Id.* at 9.) On July 11, Jackson experienced a bad nosebleed. (*Id.*) Jackson alleges that during the seven months of interactions with the medical department about his nose, he attempted to address his concerns with other officials at various times, but generally received responses directing him back to the medical department. (*Id.* at 11-12.)

Jackson asserts *Bivens* claims for deliberate indifference to his serious medical needs, as well as a negligence claims pursuant to the Federal Tort Claims Act ("FTCA"). (*Id.* at 9-10.) His claims are predominately based on allegations that the Defendants failed to provide treatment for an infection in his nose causing him to experience seven months of continuous nose bleeds. (*Id.*) On August 27, 2019, this Court dismissed all claims against most of the named defendants, but left standing a Federal Torts Claims Act ("FTCA") claim against the United States and certain *Bivens* claims against five individual defendants, Kistler, Nelson, Dalmasi, Cassano and Lawrie.

## II. STANDARD OF REVIEW

Defendants have filed a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction in fact. On a motion to dismiss for lack of subject matter jurisdiction where the motion makes a fact-based challenge to the Court's jurisdiction, the Court is not required to accept the facts as alleged by the plaintiff. *Turicentro v. American Airlines*, 303 F.3d 293, 300 n. 4 (3d Cir. 2002). In addition, the Court is not restricted to the face of the pleadings, but may review any evidence to

resolve factual disputes concerning the existence of jurisdiction. *Id.* In the instant matter, Defendants move to dismiss this action for lack of jurisdiction because Jackson allegedly failed to exhaust administrative remedies.

In addition to lack of jurisdiction, Defendants also argue that the Complaint should be dismissed for failure to state a claim. Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) require the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). The Court must "accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff," but disregard "threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" in determining whether a plaintiff has stated a claim. *See City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp*, 908 F.3d 872, 878 (3d Cir. 2018) (quotations omitted). As Jackson is proceeding *pro se*, the Court construes his allegations liberally. *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

### III.   DISCUSSION

#### A.   FTCA Claim Against the United States

The Federal Tort Claims Act ("FTCA") waives the sovereign immunity of the United States for torts of federal employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The United States is the only proper defendant in a FTCA action. *See CNA v. United States*, 535 F.3d 132, 138 n.2 (3d Cir. 2008). The FTCA allows federal inmates to sue the United

States for injuries sustained while incarcerated. *See, e.g.*, *Ynfante v. United States*, 2015 WL 631055, at *4 (M.D. Pa. Feb. 12, 2015).

However, to pursue a FTCA claim against the United States, a tort claimant must first bring an administrative claim against the responsible agency. *See McNeil v. United States*, 508 U.S. 106, 113 (1993). To exhaust administrative remedies, a plaintiff must perform two discrete acts: (1) provide the appropriate agency with written notification of the incident and a claim for money damages in a sum certain within two years after the claim accrues; and (2) allow the agency six months to consider the claim presented. See 28 U.S.C. § 240l(b); 28 C.F.R. § 142. The Third Circuit has held that "[i]n light of the clear, mandatory language of the statute, and the strict construction of the limited waiver of sovereign immunity by the United States…the requirement that the appropriate federal agency act on a claim before suit can be brought is jurisdictional and cannot be waived." *Roma v. United States*, 344 F.3d 352, 362 (3d Cir. 2003). As a result, a claim brought under the FTCA where the plaintiff has not exhausted his administrative remedies prior to the filing of suit is subject to dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *Abulkhair v. Bush*, 413 F. App'x 502, 506 (3d Cir. 2011).

For a BOP inmate, the procedure to file an administrative claim is outlined in Program Statement 1320.06, Federal Tort Claims. (ECF No. 35, Ex D.) A claimant must file with the Regional Office where the act occurred within two years after the claim occurred. *See* PS 1320.06 at 2-4. Claims can be filed on the standardized form SF-95 (Claim for Damage, Injury or Death), but are not required to be on this specific form as long as the filing includes the date and place of incident, explanation of events, witnesses, description of injury or loss, sum certain, date of claim and claimant's signature. *Id.* at 3. The BOP has a computerized database to track all claims filed with the agency. BOP has reviewed its database and discovered that plaintiff did not

7

file an administrative claim for any act in this complaint. ECF No. 35, Ex. B at ¶ 3. While Jackson has satisfied the BOP's internal grievance policy, these steps do not suffice under the FTCA. The FTCA's administrative remedy requirement pursuant to 28 U.S.C. §§ 2675, *et seq*., is a procedure separate and distinct from the prison remedies provided under 28 C.F.R. §§541.20 *et seq*. *See Cuello v. United States*, 2013 WL 1338839 at *6 (E.D.N.Y. Mar. 29, 2013) (describing difference between FTCA exhaustion and PLRA exhaustion); *Brown v. United States*, 2012 WL 7655323 at *2 (S.D.Miss. Dec. 19, 2012), *citing Murrey v. United States,* 73 F.3d 1448, 1452 (7th Cir. 1996) (holding that to pass muster under the FTCA, a claim must contain the information required by Standard Form 95); *Lambert v. United States*, 198 Fed. Appx. 835, 840, (11th Cir. 2006) ("there are separate procedures for exhausting tort claims and claims involving the conditions of confinement"); *Smith v. United States Dep't of Justice*, 2012 WL 5590831 at *2 (N.D.Fla. Oct. 11, 2012) (finding inmate grievances sufficient to exhaust *Bivens* action, but not FTCA claim); *McDaniels v. Richland County Public Defenders Office*, 2012 WL 1565618 at *5 (D.S.C. Mar. 27, 2012) (holding BOP prison grievances not sufficient to satisfy FTCA exhaustion requirements); *Marks v. United States*, 2007 WL 3087157 at *3 (W.D Wash. Oct. 19, 2007) ("[t]he filing of a grievance at an institution is not the same as making an official tort claim demand, addressed to the proper agency."). Accordingly, as Jackson failed to file a proper administrative claim before commencing this action, his FTCA claim is dismissed.

      **B.**    *Bivens* **Claim Against Kistler**

In contrast to FTCA actions, a *Bivens* claim can only be asserted against individual officials. *Ynfante*, 2015 WL 631055, at *5. Jackson brings a *Bivens* claim against Nurse Practitioner Kistler, who is a commissioned officer in the United States Public Health Service ("USPHS"). USPHS employees are shielded from personal liability for acts taken during the

performance of their duties by 42 U.S.C. Section 233, which is part of the Public Health Services Act. That section provides, in pertinent part:

> The remedy against the United States provided by [the Federal Tort Claims Act, 28 U.S.C. Sections 1346(b) and 2672] . . . for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the officer or employee whose act or omission gave rise to the claim.

42 U.S.C. § 233(a). Thus, USPHS employees enjoy an absolute statutory immunity from all *Bivens* claims. This statutory grant of immunity was affirmed by the Supreme Court in *Hui v. Castaneda*, where it was determined that the language set forth in Section 233(a) precluded a *Bivens* action against USPHS employees for harms arising out of the performance of medical or related functions within the scope of their employment. 559 U.S. 799, 801 (2010).

As Kistler served as a USPHS commissioner officer during the relevant period, she has statutory immunity conferred upon her by Congress. *See* ECF No. 35, Ex. C. Accordingly, all claims against her are dismissed pursuant to 42 U.S.C. § 233(a).

      C.    *Bivens* **Claims Against Cassano and Lawrie**

Kevin Cassano is the Health Services Administrator at FDC-Philadelphia. Peter Lawrie was the Associate Warden for Operations during the relevant time period. It is well-settled that the doctrine of *respondent superior* cannot form the basis of a *Bivens* claim. In *Iqbal*, 129 S.Ct. 1937, the Court clearly states that a *Bivens* defendant can only be held responsible for his or her own actions and is not liable for the misconduct of a subordinate. *See also Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *Parker v. United States*, 197 Fed. App'x. 171, 173 n.1 (3d Cir. 2006); *Farmer v. Carlson*, 685 F. Supp. 1335, 1338 (M.D. Pa. 1988). A *Bivens* plaintiff must plead and later prove that some affirmative act or omission was committed by each individual defendant to

9

submit that official to personal liability for the actions of another. *See Brown v. Grabowski*, 922 F.2d 1097 (3d Cir. 1990). Unless a plaintiff pleads an affirmative link between the supervisor's personal participation, his/her exercise of control or direction, or his/her failure to supervise, a superior cannot be held liable for a subordinate's acts in a civil rights action. *See Sutton v. Rasheed*, 323 F.3d 236, 249 (3d. Cir. 2003); *Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987).

A bare allegation that someone in supervisory authority has been deliberately indifferent, without any specification of that person's contact with the plaintiff, nor even an explicit charge of inadequate training or supervision of subordinates is not sufficient to state a *Bivens* claim. *See Mohney v. Pennsylvania*, 809 F.Supp.2d 384, 391 (W.D. Pa. 2011). The personal involvement of a supervisory defendant may be shown by evidence that the defendant: (1) directly participated in the constitutional violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; (4) was grossly negligent in supervising subordinates who caused the violation; or (5) failed to act on information indicating that unconstitutional acts were occurring. *See Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006).

Jackson has presented no facts or argument to suggest Cassano and/or Lawrie actively participated in his medical care and treatment to the extent they could have personally denied him medical care. These two defendants are apparently named because of their supervisory role without any personal involvement in Plaintiff's allegations. As Jackson cannot state a *Bivens* claim against Cassano and Lawrie based upon *respondent superior*, the *Bivens* claims against them are dismissed.

### C. *Bivens* Claims Against Dalmasi and Nelson

Plaintiff's *Bivens* claims against defendants Dr. Dalmasi and Nurse Practitioner Nelson should be dismissed because they are entitled to qualified immunity. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Bayer v. Monroe County Children and Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009).

The qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 112 S. Ct. 534, 537 (1991) (*per curiam*). The Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage of the litigation." *Hunter*, 502 U.S. at 227 (citations omitted); *see also Saucier v. Katz*, 533 U.S. 194, 200 (2001) (where a defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive); *see also Green v. Maraio*, 722 F.2d 1013, 1019 (2d Cir. 1983) (quoting *Harlow*, 457 U.S. at 814) (whenever the complaint itself establishes the basis for finding qualified immunity, dismissal under Federal Rule of Civil Procedure 12(b)(6) "permit[s] [i]nsubstantial lawsuits [to] be quickly terminated). When an individual government official raises a qualified immunity defense in a suit for an alleged violation of a constitutional right, courts must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the violation of a clearly established constitutional right. *See Saucier*, 533 U.S. at 201.

The Third Circuit uses a two-prong inquiry to determine whether a government official is

entitled to qualified immunity. *George v. Rehiel*, 738 F.3d 562 (3d Cir. 2013); *Pollock v. City of Philadelphia*, 403 Fed. Appx. 664, 669 (3d Cir. 2010). The first prong requires a court to "decide whether the facts … shown … make out a violation of a constitutional right." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Under the second prong, a court must "decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct. *Id.* (quoting *Pearson*, 555 U.S. at 232.) (internal quotation marks omitted). Courts are permitted to use discretion as to which prong to apply first. *Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231. Qualified immunity is an affirmative defense, and the burden of pleading it rests with the defendant. *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).

Jackson asserts Dalmasi and Nelson violated his Eighth Amendment rights by failing to provide adequate medical care. A prisoner claiming an Eighth Amendment denial of adequate medical care violation must allege and ultimately prove that prison officials acted with deliberate indifference to a serious medical need. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). A prisoner's medical need is serious when it "has been diagnosed by a physician as requiring treatment" or is so obvious that a layperson would recognize the need for professional medical care. *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987). A plaintiff can establish deliberate indifference when the record would allow the fact finder to conclude that a prison official is subjectively aware of the risk of substantial harm to an inmate but failed to respond. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). A determination of a serious medical need is objective and a plaintiff's self-diagnosis or

unsupported beliefs will not suffice. *See Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994); *Pilkey v. Lappin*, 2006 WL 1797756 at *5 (D.N.J. June 26, 2006). Second, when the seriousness of an alleged injury would not be apparent to a layperson, an inmate must present medical expert testimony. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017). Jackson has not provided any expert opinion to support his case; nor would the seriousness of the alleged injury be apparent to a layperson. Therefore, Jackson's complaint does not establish a serious medical need.

Jackson also fails to allege facts that establish Dalmasi and Nelson were deliberately indifferent to his condition. When an inmate claims that he has been provided inadequate care, the mere receipt of inadequate care does not establish deliberate indifference; the requisite state of mind must also be present when providing that inadequate care. *See Pearson*, 850 F.3d at 538. A prisoner has no right to choose a specific form of medical treatment, so long as the treatment provided is reasonable. *See Harrison v. Barkley,* 219 F.3d 132, 138–140 (2d Cir. 2000); *Davis v. First Corr. Med.,* 589 F.Supp.2d 464 (D.Del. 2008). A prisoner's disagreement with the medical care provided does not amount to inadequate care. *See McFadden v. Dalmasi*, 2019 WL 6218220, at *7 (E.D. Pa. Nov. 21, 2019), *aff'd*, 837 Fed. Appx. 135 (3d. Cir. 2020). When medical care is provided, courts assume the treatment is adequate absent evidence that it violates the standards of care. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). An inmate's claims against members of a prison medical department are not viable where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *See Estelle* 429 U.S. at 97. Mere disagreement as to the proper medical treatment

is insufficient to state a constitutional violation. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir.2004).

Accordingly, Jackson's vague allegations must fail because the medical records demonstrate that he received medical care for his complaints even if the medical care provided differs from Jackson's opinion regarding what care would have been appropriate. *See Palmer v. Carroll*, 640 F.Supp.2d 542, 548 (D.Del. 2008) (Court reviewed medical records and determined that record belied allegation that staff was indifferent to serious medical need); *Kerce v. Ball*, 2010 WL 5300877 at *2 (December 20, 2010 E.D.Pa.) (plaintiff's admission that he received treatment ended claim for deliberate indifference).

Jackson has not alleged any facts that show Dalmasi and Nelson disregarded an excessive risk to his health, which he must prove for his claim to proceed. *See Farmer*, 511 U.S. at 835. BOP Medical staff continually monitored and treated Jackson's conditions while he was housed at FDC Philadelphia. Dalmasi referred Jackson to an outside specialist and followed the specialist's recommendation. Defendants following this course of action within the confines of a prison setting could reasonably conclude that they were acting prudently and not in violation of Jackson's constitutional rights. Therefore, Jackson cannot establish that Dalmasi and Nelson were deliberately indifferent to his medical needs and cannot prevail on his *Bivens* claims.

### IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted and this matter is dismissed.